IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JEFFREY PRESTON MCCLUNG | * | |
| Petitioner | | |
| v. | * | CIVIL ACTION NO. WDQ-02-3557 |
| LISA HOLLINGSWORTH, WARDEN[1] | * | |
| Respondent. | | |
| | *** | |

MEMORANDUM

Petitioner is a U.S. Bureau of Prisons ("BOP") inmate confined at the Federal Correctional Institution in Cumberland, Maryland ("FCI-Cumberland") who filed a 28 U.S.C. § 2241 petition for a writ of habeas corpus to (i) vacate and expunge a disciplinary finding of guilt, and (ii) restore 41 days good conduct time ("GCT") lost as a result of a September, 2001, disciplinary sanction.[2] For reasons stated below, the Court will dismiss the Petition.

THE PROCEDURAL HISTORY

This Court granted the Respondent's Motion to Dismiss or, in the Alternative, for Summary Judgment in May of 2003. In February of 2004, the Fourth Circuit affirmed in part and vacated in

---

[1] Lisa Hollingsworth is the current Warden at the Federal Correctional Institution in Cumberland, Maryland. The docket shall be amended accordingly.

[2] According to the petition, at approximately 11:00 p.m. on September 1, 2001, an FCI-Cumberland unit officer searched the cell McClung shared with Richard Stach and found a prison-made knife. The two inmates were charged with possessing a dangerous weapon and subsequently convicted and sanctioned with the loss of GCT and 30 days disciplinary segregation. Summary judgment was granted to BOP on Stach's identical petition for habeas corpus relief, *see Stach v. Shearin*, Civil Action No. WDQ-02-3558 (D. Md.), and affirmed in *Stach v. Shearin*, 80 Fed.Appx. 821 (4th Cir., Nov. 10, 2003) (unpublished).

part, returning the case to this Court for an evidentiary hearing.[3]  *See McClung v. Shearin*, 90 Fed. Appx. 444, 2004 WL 225093 (4th Cir. Feb. 6, 2004).

Respondent's renewed and opposed Motion to Dismiss or, in the Alternative, for Summary Judgment was denied without prejudice on February 9, 2005.  Counsel was appointed to represent Petitioner.[4]  An evidentiary hearing was conducted on December 5, 2005.

## THE EVIDENCE

On Saturday, September 1, 2001, there were 139 inmates assigned to FCI-Cumberland Unit A1, where Petitioner was housed on the first floor in cell 122 with Richard Stach.  Respondent is unable to state how many inmates were present on the unit at any time that day.

All 64 cells in Unit A1 at FCI-Cumberland are manually locked at 11:20 p.m. each night and unlocked at 5:30 a.m. on weekdays and 6:30 a.m. on holidays and weekends, unless an inmate makes a special request to have his door locked because of various concerns.  There are no surveillance systems in Unit A1 at FCI-Cumberland, and there are no regulations restricting inmates from walking in the corridors or stopping in front of the cells in Unit A1.  Inmates are not, however, allowed to be in another inmate's cell unless the occupant is present.  On September 1, 2001, there was one correctional officer assigned to Unit A1 to monitor and supervise inmates during each shift. The officer is responsible for maintaining the security of the housing unit and conducting five random cell searches and common area searches per shift.

---

[3]  The Fourth Circuit directed this Court to address the issue of "constructive possession" under BOP policy and its relationship to the "some evidence" standard given Petitioner's allegation that: (i) when he was given his incident report his cell was unlocked and therefore accessible by other inmates; and (ii) the number of inmates with access to his cell was 130.  *McClung*, 90 Fed. Appx. at 446.  "[C]onstructive possession provides 'some evidence' of guilt only when relatively few inmates have access to the area," Respondent "provided no evidence whatsoever regarding the accessibility of McClung's cell."  *Id*.

[4]  The Court commends pro bono counsel for his earnest and hard work in representing Petitioner.

2

The Petitioner was employed from 7:30 a.m. to 3:30 p.m., Monday through Friday. Cellmate Stach was employed from 12:30 p.m. to 8:30 p.m., Monday through Friday, and from 9:30 a.m. to 11:00 a.m. on Fridays only. Respondent indicates that in the morning between 7:30 a.m. and 11:00 a.m., there are approximately 50 to 80 inmates remaining in the unit.

Senior Officer Donald Strain conducted the search of Petitioner's cell on September 1, 2001. In deposition testimony submitted by McClung, Strain stated from 50 to 70 percent of the inmates on Unit A1, depending upon the menu and television sports offerings, dine in the unit. Strain testified that inmates are placed on "lock down" at approximately 9:00 p.m. for a head count and their cell doors are manually locked. Upon completion of the head count, the doors are unlocked, and inmates are permitted to come out again until final evening lock down. Strain indicated that on weekends officers make more frequent rounds because more inmates are out of their cells.

Officer Strain testified that cell 122 in Unit A1 is three to four cells from the front door or "sally port" leading to the unit, is close to the common area television, and is 20 to 30 feet away from the center of the officer's station. Each cell is approximately 50 to 70 square feet. Officer Strain testified that the search of Petitioner's cell was conducted randomly, and he found a seven-inch homemade weapon made of some form of metal, with a grip handle, under the desk. Officer Strain testified that (i) there are no openings at the end of the desk into which the weapon could have been slid, (ii) he did not see another inmate go into the cell, (iii) Petitioner had neither complained about other inmates accessing his cell without permission, nor asked officers to secure his cell door when on out-of-cell activities, (iv) the area within a cell is not a common area of Unit A1, and (v) if he were to find an inmate alone in another inmate's cell, he would probably conduct a complete pat search of the inmate, conduct a cell shake down, and inform the lieutenant's office.

On cross-examination, Officer Strain testified that McClung was not in the cell when the search was conducted. He further acknowledged that on September 1, 2001, Unit A1 inmates were subject to the "late night" policy on Friday and Saturday nights, when inmate's cells are not locked down until 2:00 a.m. Officer Strain testified that although his work assignment at that time was the visitation building, he switched with another officer to work that Saturday night to attend his child's Saturday morning game.

Senior Officer Shawn McGusker testified by deposition that on September 1, 2001, he was working on Unit A1 tier from 7:35 a.m. to 4:05 p.m. His routine shift duties were to (i) relieve the morning officer and log in the office, (ii) make periodic rounds, (iii) go the officer's station or office, for miscellaneous administrative work; (iv) monitor the sally ports, entrance, and exits from the unit; and (iv) conduct, at a minium, five shakedowns of the cells. McGusker indicated that during these shakedowns he is only observing the cell, not anything outside the cell. On September 1, 2001, he locked the cell doors for the 10:00 a.m. and 4:00 p.m. counts.

Senior Officer Shannon Biser testified that he worked the morning watch on Unit A-1 and on September 1, 2001, saw no unauthorized inmates going into Petitioner's cell; Petitioner made no complaint about another inmate being in his cell without permission.[5] Officer Biser further asserted that due to the "late night" policy in effect on Saturday, September 1, 2001, if an inmate did not want his cell unlocked after the 12:00 a.m. count, he would put "please do not unlock" on the cell door.[6]

---

[5]   Officer Biser testified that on September 1, 2001, Petitioner was not officiating a softball contest as he maintained in his affidavit.

[6]   In deposition testimony noted by Petitioner, Officer Biser indicated that that Unit A-1 cell doors are unlocked at 6:30 a.m. and that "mainline" or breakfast is called at 7:00 a.m., at which time inmates may go to chow, stay in their cells, go the common area, or take a shower. He acknowledges that it is "possible" for an inmate to go into another inmate's cell undetected by him.

During the evening of Saturday, September 1, 2001, Petitioner was in his housing unit. Petitioner states that he left his cell to retrieve ice from the common area in Unit A1 at approximately 10:50 p.m. that night and returned to find Officer Strain in his cell with the door closed. He claims that his cellmate Richard Stach was out of the cell playing cards. After an unspecified period of time during which he attempted to observe Officer Strain, Petitioner states that he saw Strain exit his cell and lock the door. Both Petitioner and Stach were ordered to the lieutenant's office, handcuffed, and placed on administrative segregation in response to the discovery of the knife in their cell.

At the evidentiary hearing Disciplinary Hearing Officer ("DHO") Curtis Hise testified that when reviewing the evidence he considered (i) Officer Strain's incident report, the location of the weapon and Petitioner's employment with UNICOR, (ii) a photograph of the weapon, (iii) the weapon is elaborate manufacture that no one would use "simply ... to ... set up an inmate," (iii) Petitioner's testimony that the weapon was not accessible to him and that he was set up, (iv) that the weapon was found during a search and not as a result of an informant's note, and (v) the weapon was found in Petitioner and Stach's cell.

Petitioner asserts that because (i) his cell is unlocked during the day and open to all inmates, (ii) one assigned Unit A1 officer, with an abundance of duties, cannot possibly monitor all other inmates, and (iii) there is no surveillance system to monitor inmates, he cannot be found in "constructive possession" of the weapon. Therefore, he argues the disciplinary conviction was not supported by sufficient evidence to comport with due process.

Respondent maintains there is sufficient evidence to support the DHO's decision, i.e., (i) the weapon was found in Petitioner's cell in a non-accessible area,[7] (ii) the knife was found as a

---

[7] It is the policy of the BOP under Program Statement 5270.07, 28 C.F.R. § 541.12, that each inmate is responsible for keeping his area free of contraband.

result of a random search, not in response to a confidential informant, and (iii) Petitioner provided no evidence to the DHO to support his claim that the weapon was planted. In addition, Respondent asserts that Petitioner's claim that the Unit A1 inmate population had unencumbered access to his cell lacks merit due to his cell location, staff monitoring, and prison policies relating to an inmate's entry into another inmate's cell.

## Discussion

On September 1, 2001, Unit A1 contained many open common areas accessible to all inmates. These included the common television areas, showers, laundry room, and barber shop. The 64 cells on Unit A1, housing approximately 139 inmates, are not common areas. Each had a door and contained a bed, chair, sink, toilet, and a framed desk with a solid base. Under the "lock down" policy in Unit A1 all cell doors remained unlocked during the day and evening, unless a census head count is being conducted and/or an inmate asks to have his cell door locked. Cell doors can only be locked or unlocked manually. There is no dispute that the only times when an inmate's cell door is locked after 5:30 a.m. (6:30 a.m. on the weekends) are during the brief times when the census counts are conducted and after the night "lock down."

From Monday through Friday, most Unit A1 inmates are out of the unit on work shifts or in educational and recreational programming. If an inmate remains in the unit during normal work hours, he must have permission to be there.[8] Usually there are 50 to 80 inmates on the Unit in the morning. The number significantly decreases in the afternoon due to work schedules and recreation. On the weekends the average number of inmates in the unit increases as inmates are not working. Unit A-1 has one correctional officer, for each shift, who makes rounds, monitors the prisoners and conducts cell inspections. During the daytime, each is assisted by a Unit Manager, two Case

---

[8] *See* Ansel Decl., Respondent's Ex. 18.

Managers, two counselors, and a secretary who are in the unit from 7:30 a.m. to 4:00 p.m.[9]  There is no evidence that all 139 inmates had access to McClung's cell without his permission.[10]

Inmates may not be deprived of their lives, liberty or property without due process of law. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974).  An inmate has a strong interest in ensuring that a loss of good behavior credits is not arbitrarily imposed by a disciplinary board.  *See Superintendent, Massachusetts Correctional Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985).  Under *Hill*, a DHO's decision should not be overturned if his disciplinary determination is supported by "some evidence."  *See Hill*, 472 U.S. at 455; *see also Baker v. Lyles*, 904 F.2d 925, 931 (4th Cir. 1990)  The *Hill* standard does not require an examination of the entire record, independent assessment of the credibility of the witness, or the weighing of evidence.  The relevant question is whether there is "some evidence" in the record which could support the conclusion reached by the disciplinary board.  *Id*. at 455.

Petitioner has consistently maintained that he had no knowledge of the 7-inch knife found in his cell.  He argues that in light of the open door policy on Unit A-1 and the possible access of all 139 Unit A-1 inmates to his cell, a one in 139 probability that the weapon was his is not "some evidence." Such an argument follows the reasoning in *Hamilton v. O'Leary*, 976 F.2d 341 (7th Cir. 1992), where the court held that an inmate constructively possessed weapons found in the cell he shared with three others, but observed in dicta that had the cell been accessible by 32 others as the inmate argued, the evidence would have been insufficient to support a conviction.

---

[9]  *See* Todd Giarth Decl., Respondent's Ex. 17b.

[10]  According to the deposition testimony of Case Manager Todd Guyarth , an inmate is not permitted to be in another inmate's cell unless the occupant is present.  Guyath states that on weekends or holidays (i) most inmates do not work and (ii) other than at meal times, there are approximately 50 to 100 inmates in the unit.

Neither *Hamilton* nor any case in this circuit forbids punishment for joint possession of contraband by inmates housed together. Although *Broussard v. Johnson*, 253 F.3d 874 (5th Cir. 2001) relieved an inmate of liability for a pair of bolt cutters in a kitchen area (where the inmate worked) accessible to approximately 100 other inmates, the cell in this case was the exclusive domain of McClung and his cellmate. Petitioner has presented no evidence that other inmates had entered his cell.[11] The Due Process Clause does not require continuous lock-down as a prerequisite to imposing punishment for the joint possession of contraband in an inmate's cell.

## CONCLUSION

Officer Strain's incident report regarding the discovery of the knife in Petitioner's cell, underneath a desk, provided "some evidence" to support DHO Hise's finding of guilt. For this reason, the Petition shall be dismissed.[12] A separate Order follows.

Date: March 31, 2006                                    /s/
                                                William D. Quarles, Jr.
                                                United States District Judge

---

[11] The constructive possession doctrine has been applied to the search of an "open" cell. *See e.g., White v. Kane*, 860 F.Supp. 1075, 1079 n. 5 (E.D. Pa.1994) (although probability approach may be problematic when cell unlocked at time of search and every inmate in cell block had access to cell, disciplinary hearing officer could rely on guard's report of contraband found in cell).

[12] Petitioner has filed a Motion to Strike Respondent's Supplemental Reply. Paper No. 67. The Motion shall be denied.